## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 21-CV-60152-STRAUSS

**ECAPITAL COMMERCIAL**
**FINANCING CORP.,**

      Plaintiff,

v.

**HITACHI CAPITAL**
**AMERICA CORP.,** *et al.*,

      Defendants.

_____/

### ORDER DENYING ECAPITAL COMMERCIAL
### FINANCING CORP.'S MOTION FOR SUMMARY JUDGMENT

**THIS MATTER** came before the Court upon the Motion for Summary Judgment ("Motion") [DE 74] filed by Plaintiff/Counter-Defendant, eCapital Commercial Financing Corp. ("eCapital"). Pursuant to the Motion, eCapital seeks summary judgment on all four counts of the Counterclaim [DE 32] filed by Defendant/Counter-Plaintiff, Hitachi Capital America Corp. ("Hitachi").[1] I have reviewed the Motion, the Response [DE 92] and Reply [DE 96] thereto, all other summary judgment materials, and all other pertinent portions of the record. For the reasons discussed herein, the Motion [DE 74] is **DENIED**.

### PRELIMINARY ISSUE REGARDING PARTIES' STATEMENTS OF FACTS

Before summarizing the factual background, I find it necessary to address certain deficiencies with the parties' statements of facts. Under Local Rule 56.1, a party moving for summary judgment must file a Statement of Material Facts with its motion, which must list the

---

[1] eCapital's Complaint [DE 1] against Hitachi and another defendant was previously dismissed [DE 67] in accordance with the parties' Stipulation of Dismissal of Plaintiff's Claims [DE 65].

material facts that the movant contends are not genuinely disputed.  S.D. Fla. L.R. 56.1(a)(1).  The opposing party must also file a Statement of Material Facts, which must "clearly challenge any purportedly material fact asserted by the movant that the opponent contends is genuinely in dispute."  S.D. Fla. L.R. 56.1(a)(2).  After responding to such purported material facts, the opposing party may include any additional facts that it believes will help defeat the motion.  *Id.*  If the opposing party does include any such additional facts, the movant is *required* to respond to those additional facts.  S.D. Fla. L.R. 56.1(a)(3), (b)(3).  The rule contains several important requirements that must be followed in preparing each respective statement of facts.

Local Rule 56.1 is intended to "serve[] the valuable purpose of crystallizing the relevant factual disputes for the Court by allowing the non-movant to contest the specific factual assertions in each paragraph of the movant's statement."  *Daneshpajouh v. Sage Dental Grp. of Fla., PLLC*, No. 19-CIV-62700-RAR, 2021 WL 3674655, at *2 (S.D. Fla. Aug. 18, 2021) (quoting *Laremore v. Holiday CVS, LLC*, No. 20-CIV-61650-RAR, 2021 WL 3053348, at *3 (S.D. Fla. July 20, 2021)).  *See also Cannon v. Delray Realty Assocs., LLC*, No. 20-81178-CIV, 2021 WL 2661462, at *1 (S.D. Fla. Apr. 26, 2021) ("When a party properly complies with Local Rule 56.1, it is relatively easy for a court to determine whether there is a genuine disputed issue of fact. Failure to follow the letter and spirit of this imperative local rule imposes on the Court "an arduous process, and, in any event, generates unnecessary work for the court and its staff." (internal quotation marks and citation omitted)); *Bejerano v. Flex Fla. Corp.*, No. 18-20049-CIV, 2020 WL 4059604, at *3 (S.D. Fla. July 20, 2020) ("Not only does Local Rule 56.1, like the other local rules, have the force of law, it also serves more than a technical purpose: [T]he rule's clear procedural directive is intended to reduce confusion and prevent the Court from having to scour the record and perform time-intensive fact searching." (internal quotation marks and citation omitted)); *Levin v.*

*Nationwide Home Loans, Inc.*, No. 13-60306-CIV, 2014 WL 11531634, at *1 (S.D. Fla. Mar. 14, 2014).

Here, eCapital first filed a largely compliant Statement of Material Facts along with its Motion. *See* eCapital Commercial Financing Corp.'s Statement of Material Facts in Support of Its Motion for Summary Judgment ("e-SMF") [DE 73]. Next, Hitachi filed its Response Statement of Material Facts at the same time it responded to the Motion. *See* Response of Hitachi Capital America Corp. to eCapital Commercial Financing Corp.'s Statement of Material Facts in Support of Its Motion for Summary Judgment ("Hi-RSF") [DE 93]. Hitachi also filed a completely separate statement containing additional facts as an attachment to its RSF. *See* Statement of Material Facts of Hitachi Capital America Corp. in Support of Its Memorandum in Opposition to eCapital Commercial Financing Corp.'s Motion for Summary Judgment ("Hi-ASF") [DE 93-1]. eCapital did not file the mandatory reply statement of facts.

As eCapital noted in its Reply [DE 96], Hitachi's Response Statement of Material Facts (Hi-RSF) failed to comply with significant aspects of Local Rule 56.1. When a non-moving party disputes a fact in the movant's statement, "the evidentiary citations supporting [its] position must be limited to evidence specific to that particular dispute." S.D. Fla. L.R. 56.1(b)(2)(C). However, Hitachi often ran afoul of this rule, sometimes including an entire page in response to a sentence. Additionally, for some of the facts presented by eCapital, Hitachi would note that they were undisputed subject to further response or explanation. If further explanation is needed, that is precisely what "additional facts" are for under the rule. Given these violations, where Hitachi indicated that it "disputed" a fact, I only consider its response and supporting citations for the sole purpose of determining whether it adequately demonstrated that the fact is genuinely in dispute. After all, that is the purpose of requiring statements of facts – to determine what is genuinely in

dispute.  Where Hitachi indicated that a fact is undisputed but nevertheless provided further explanation or response, I ignore that further explanation or response (to the extent it is not included in Hi-ASF).

As to Hitachi's separate statement containing additional facts (Hi-ASF), Hitachi again violated the Local Rule's requirements regarding "additional facts," which provides as follows:

> Any additional facts that an opponent contends are material to the motion for summary judgment shall be numbered and placed immediately after the opponent's response to the movant's Statement of Material Facts. The additional facts shall use separately numbered paragraphs beginning with the next number following the movant's last numbered paragraph. The additional facts shall be separately titled as "Additional Facts" and may not exceed five (5) pages (beyond the ten- (10) page limit for the opponent's Statement of Material Facts.

S.D. Fla. L.R. 56.1(b)(2)(D).  Hitachi did not place its additional facts immediately after its responses to eCapital's facts (it filed a separate document as an attachment), did not number its additional facts starting at 52 (eCapital left off at 51), and did not include "Additional Facts" in the title.  Its statements also massively exceeded the page limits (using 40 pages in total even though the Court only approved up to 20) and contained several overly-lengthy paragraphs that were not limited to single material facts.  *See* S.D. Fla. L.R. 56.1(b)(1)-(2).  Overall, Hitachi made the Court's job substantially more difficult than it should have been by failing to comply with the letter and spirit of the local rule.

Nonetheless, the biggest problem here is that eCapital failed to reply to Hitachi's additional facts.  In such a situation, Local Rule 56.1(c) provides:

> All material facts in any party's Statement of Material Facts may be deemed admitted unless controverted by the other party's Statement of Material Facts, provided that: (i) the Court finds that the material fact at issue is supported by properly cited record evidence; and (ii) any exception under Fed. R. Civ. P. 56 does not apply.

S.D. Fla. L.R. 56.1(c).  Thus, I find it appropriate to deem Hitachi's additional facts (in Hi-ASF) admitted provided that they are supported by properly cited record evidence, provided that no Rule 56 exception applies, and provided that they are not controverted by eCapital's statement of facts (e-SMF).  I recognize that this is arguably somewhat unfair to eCapital given the violations by Hitachi that are discussed above.  But eCapital failed to file a mandatory filing altogether. Moreover, even if eCapital had filed a reply statement, it is likely the Motion would be denied anyway (in light of the analysis below).  Regardless, with the Motion being denied, this case will be decided on the merits at trial.[2]

## **BACKGROUND**

Hitachi, a secured creditor of Global Merchant Finance, Inc. f/k/a Trade Finance Solutions Holdings, Inc. ("GMF"), has sued eCapital, an affiliate of GMF, for eCapital's receipt of alleged fraudulent transfers from GMF.  The Counterclaim contains fraudulent transfer claims in Counts I and II, a conversion claim in Count III, and an unjust enrichment claim in Count IV.

Hitachi and two entities affiliated with eCapital, including GMF,[3] are parties to a Credit Agreement [DE 32-1] dated March 31, 2016.  *See* e-SMF ¶¶ 1-2 (undisputed).  Hitachi is the lender under the Credit Agreement; GMF is the borrower.  *Id.* ¶¶ 1, 3 (undisputed).  eCapital (a/k/a Paragon Financial Corp.)[4] is not a party to the Credit Agreement.  GMF is a special purpose vehicle

---

[2] Moving forward, the Court expects full compliance with the Local Rules (and Court orders). This case involves sophisticated parties and skilled attorneys.  There is no excuse for both parties' failures to comply with Local Rule 56.1.

[3] GMF and eCapital are sister companies that are both owned by eCapital Corp. ("Parent Co."). Parent Co. was formerly known as TFS Canada Bond Series, Inc. – the other party to the Credit Agreement along with GMF and Hitachi – among other names.  Hi-ASF ¶ 4.

[4] Paragon Financial Corp. is an entity that eCapital acquired in 2018.  e-SMF ¶ 6 (undisputed). However, the parties appear to treat Paragon and eCapital synonymously for purposes of the Motion.

that was formed for the purpose of holding collateral securing loans made by Hitachi under the Credit Agreement. *Id.* ¶ 4 (undisputed). At the time Hitachi and GMF entered into the Credit Agreement, they also entered into a related Borrower Security Agreement, pursuant to which GMF granted Hitachi a security interest in the collateral securing GMF's obligations to Hitachi. *See* [DE 32-2] § 3. A large portion of the collateral was comprised of accounts receivable that eCapital had purchased and assigned to GMF. *See* e-SMF ¶¶ 12, 17; Hi-RSF ¶¶ 12, 17. Hitachi held a perfected security interest. *See* e-SMF ¶ 11 (undisputed); Hi-ASF ¶ 10.

By way of background, eCapital is in the factoring business. In general, "factoring" is "[t]he buying of accounts receivable at a discount." FACTORING, Black's Law Dictionary (11th ed. 2019). "The price is discounted because the factor (who buys them) assumes the risk of delay in collection and loss on the accounts receivable." *Id.* Thus, as a factor, eCapital would purchase accounts receivable from its customers at a discount, and it would attempt to collect the amounts due thereunder from its customers' customers. However, in certain instances, if eCapital collected accounts receivable above a certain threshold, it may have had a contractual obligation to pay certain reserve amounts to its customer. *See* [DE 73-4]; *see also* e-SMF ¶ 25; Hi-RSF ¶ 25. Nonetheless, any such contractual obligation did not affect eCapital's unconditional right to receive the entire amount owed for each receivable without any type of setoff. *See* [DE 73-4] § 11.2.2.

Certain accounts receivable that eCapital purchased were assigned to GMF. *See* e-SMF ¶ 17 (undisputed). These assigned accounts receivable (and other assets) were held by GMF in a "borrowing base." *Id.* ¶¶ 10, 17 (undisputed). No formal assignment documents were prepared to effectuate assignments to GMF. *See* e-SMF ¶ 13; Hi-RSF ¶ 13. However, borrowing base certificates ("BBC(s)") provided to Hitachi each month reflected the accounts receivable assigned

to GMF at the time BBCs were provided (essentially providing a way to track accounts receivable that moved into and out of the borrowing base each month).  e-SMF ¶¶ 14-15; Hi-RSF ¶¶ 14-15. BBCs contained the following information (in addition to other information): (1) the face value of accounts receivable used as collateral for Hitachi's loan; (2) the amounts loaned by Hitachi; and (3) a figure for net funds employed ("NFE").  e-SMF ¶ 15 (undisputed).[5]

In accordance with the Credit Agreement, Hitachi would make certain revolving loans to GMF.  Hi-ASF ¶ 6.  The maximum loan amount was initially $20,000,000 but later became $25,000,000.  *Id.*  However, the amount of available revolving loans each month depended on certain value metrics related to the collateral securing the loans made by Hitachi.  Specifically, the information contained in a BBC would be used to determine the loan amount available at the time of the BBC.  GMF could borrow (from Hitachi) up to the lesser of 75% of the collateral value or 90% of the NFE ("Total Available to Borrow").  e-SMF ¶ 21 (undisputed); Hi-ASF ¶ 15.  If the total outstanding balance exceeded the Total Available to Borrow, an overadvance would have occurred.  Hi-ASF ¶ 19.  Failure to cure such an overadvance within 3 business days – by, for example, paying Hitachi the amount of the overadvance in cash – would be an Event of Default under the Credit Agreement.  *Id.*; *see also* Credit Agreement § 10.1.

In November 2019, a substantial overadvance occurred.  *See* Hi-ASF ¶ 32; [DE 92-22]. After eCapital closed on a loan transaction with Woodforest National Bank ("Woodforest"), accounts receivable that eCapital had previously assigned to GMF, with a face value of approximately $14.39 million (and an NFE of approximately $10.33 million), were removed from

---

[5] According to eCapital, NFE refers to "the dollar amount of funds that could ultimately be collected . . . in relation to the accounts receivable."  *Id.*  According to Hitachi, NFE "is equivalent to the amount of funds paid by GMF through Hitachi Loan advances to acquire the Collateral reported on [BBCs]."  Hi-ASF ¶ 15.

the borrowing base and transferred to eCapital (the "Nov. 2019 Transfer").  *See* e-SMF ¶¶ 31, 35, 37; Hi-RSF ¶¶ 31, 35, 37; Hi-ASF ¶¶ 31-32; [DE 92-11, 92-22].  The November 2019 BBC confirmed the removal of the accounts receivable from the borrowing base.  *Compare* [DE 92-11] *with* [DE 92-22].  It also reflected an overadvance of approximately $13.93 million (the difference between the loan balance of approximately $20.26 million and the Total Available to Borrow of approximately $6.33 million).  [DE 92-22].  In addition to the Nov. 2019 Transfer, GMF also subsequently transferred additional collateral out of the borrowing base (between December 2019 and April 2020) with a face value of approximately $10 million (the "Subsequent Transfers").  *See* Hi-ASF ¶¶ 35-36.  From these transfers, eCapital received collateral with a face value of approximately $1.6 million.  *Id.* ¶ 47.

On December 16, 2019, Hitachi and GMF entered into a Letter Agreement setting forth agreements they reached following the Nov. 2019 Transfer and resulting overadvance.  [DE 92-38].  Thereunder, GMF agreed to pay $5 million towards the Hitachi loan balance on the date of the Letter Agreement and 3 monthly payments of $3 million (totaling $9 million) thereafter.  *Id.* ¶¶ 1-2.  Additionally, GMF agreed to remit payment of funds received in connection with certain accounts to Hitachi upon receipt of such funds (until June 30, 2020).  *Id.* ¶ 2.  GMF would then be obligated to pay any remaining loan balance to Hitachi on June 30, 2020.  *Id.*  Provided that GMF remained in compliance with its obligations under the Letter Agreement, Hitachi agreed to "forebear from exercising any remedies it may have under the Credit Agreement, including . . . calling any Event of Default . . . ."  *Id.* ¶ 6.

The initial 4 payments under the Letter Agreement – totaling $14 million – were made.  *See* Hi-ASF ¶¶ 46, 48; [DE 92-40].  They were made by an affiliate of eCapital and not eCapital itself.  *See* Hi-ASF ¶ 48; [DE 92-40].  No further payments, however, were made.  Therefore, GMF

still owes Hitachi the remaining loan balance of more than $6 million.  *See* Hi-ASF ¶ 46; [DE 92-39]; e-SMF ¶ 43; Hi-RSF ¶ 43.

## LEGAL STANDARD

A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Allen v. Bd. of Pub. Educ. for Bibb Cnty.*, 495 F.3d 1306, 1313 (11th Cir. 2007) (citing *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir.1996)). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."  *Hornsby-Culpepper v. Ware*, 906 F.3d 1302, 1311 (11th Cir. 2018) (internal quotation marks omitted) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

Initially, it is the moving party's "burden to demonstrate the basis for its motion, and [it] must identify the portions of the record 'which it believes demonstrates the absence of a genuine issue of material fact.'"  *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  "The movant may meet this burden by demonstrating that the nonmoving party has failed to present sufficient evidence to support an essential element of the case."  *Id.* (citing *Celotex*, 477 U.S. at 322-23).  *See also Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593 (11th Cir. 1995) (The movant may satisfy its burden "by 'showing' or 'pointing out' to the Court that there is an absence of evidence to support the non-moving party's case." (citing *Celotex*, 477 U.S. at 325)).  Provided that the moving party meets its burden, the burden then shifts to the non-moving party to show that a genuine issue of material fact exists.  *Hornsby-Culpepper*, 906 F.3d at 1311-12.

To establish a dispute of fact sufficient to avoid the entry of summary judgment, the non-moving party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *A.L. ex rel. D.L. v. Walt Disney Parks & Resorts US, Inc.*, 900 F.3d 1270, 1289 (11th Cir. 2018) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "However, a mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." *Kesinger ex rel. Estate of Kesinger v. Herrington*, 381 F.3d 1243, 1247 (11th Cir. 2004) (citing *Anderson*, 477 U.S. 242). Nevertheless, courts "must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party." *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1285 (11th Cir. 1997) (citation omitted). Moreover, all reasonable doubts regarding the facts must be resolved in favor of the non-moving party. *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1274 (11th Cir. 2008) (citation omitted).

## ANALYSIS

### I.   COUNTS I & II – FRAUDULENT TRANSFER

In Count I of the Counterclaim, Hitachi alleges the existence of actual or constructive fraudulent transfers under 6 Del. C. § 1304(a), or alternatively, § 726.105(1), Fla. Stat. In Count II, Hitachi alleges the existence of constructive fraudulent transfers under 6 Del. C. § 1305(a), or alternatively, § 726.106(1), Fla. Stat.[6] As the parties recognize, the foregoing Delaware and

---

[6] Only present creditors – those who had a "claim" against the transferor before a transfer was made – can pursue the constructive fraudulent transfer action alleged in Count II. *See* 6 Del. C. § 1305(a); § 726.106(1), Fla. Stat. However, both present creditors and future creditors – those whose "claim" arose after a transfer was made – can pursue the fraudulent transfer action alleged in Count I. *See* 6 Del. C. § 1304(a); § 726.105(1), Fla. Stat. A "claim" is "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured." 6 Del. C. § 1301(3); § 726.102(4), Fla. Stat. Because Hitachi obviously had a "claim" against GMF at the

Florida statutes are the same in substance.  Thus, regardless of whether Delaware or Florida law applies, no conflict of law exists.

To prove that an actual fraudulent transfer occurred under Delaware or Florida law, a plaintiff must show that a transfer was made "[w]ith actual intent to hinder, delay or defraud any creditor of the debtor."  6 Del. C. § 1304(a)(1); § 726.105(1)(a), Fla. Stat.  Whether a transfer was made with the requisite intent is determined based on considering several non-exhaustive factors, which are commonly referred to as "badges of fraud."  *See Wiand v. Lee*, 753 F.3d 1194, 1200 (11th Cir. 2014); *see also Yaralli v. Am. Reprographics Co., LLC*, 165 So. 3d 785, 788 (Fla. 4th DCA 2015) ("Because the determination of actual fraudulent intent can be difficult, courts look to certain 'badges of fraud' to determine whether the transfer was made with the intent to defraud creditors." (quoting *Gen. Elec. Co. v. Chuly Int'l, LLC*, 118 So. 3d 325, 327 (Fla. 3d DCA 2013))).  Those factors are whether:

> (1) The transfer or obligation was to an insider;
> (2) The debtor retained possession or control of the property transferred after the transfer;
> (3) The transfer or obligation was disclosed or concealed;
> (4) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
> (5) The transfer was of substantially all the debtor's assets;
> (6) The debtor absconded;
> (7) The debtor removed or concealed assets;
> (8) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
> (9) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
> (10) The transfer occurred shortly before or shortly after a substantial debt was incurred; and
> (11) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

---

time the alleged transfer(s) were made, Hitachi was a present creditor at the time of the transfer(s) and can thus pursue the fraudulent transfer actions alleged in both Counts I and II.

6 Del. C. § 1304(b); § 726.105(2), Fla. Stat.  "While a single badge of fraud may only create a suspicious circumstance and may not constitute the requisite fraud to set aside a conveyance, several of them when considered together may afford a basis to infer fraud." *Wiand*, 753 F.3d at 1200 (quoting *Johnson v. Dowell*, 592 So. 2d 1194, 1197 (Fla. 2d DCA 1992)) (cleaned up); *see also Yaralli*, 165 So. 3d at 789.  Consideration may also be given to other factors, and courts may take into account all of the circumstances surrounding a transfer.  *Wiand*, 753 F.3d at 1200.

Constructive fraudulent transfers, however, are not focused upon intent.  Rather, they turn on whether a transfer was made for less than "reasonably equivalent value" and whether an additional element is satisfied.  Specifically, to prove the constructive fraudulent transfer claim alleged in Count I, Hitachi must show that a transfer was made (by GMF to eCapital) without GMF "receiving a reasonably equivalent value in exchange for the transfer" and that GMF:

> a. Was engaged or was about to engage in a business or a transaction for which the remaining assets of [GMF] were unreasonably small in relation to the business or transaction; or
> b. Intended to incur, or believed or reasonably should have believed that [GMF] would incur, debts beyond [GMF's] ability to pay as they became due.

6 Del. C. § 1304(a)(2); § 726.105(1)(b), Fla. Stat.  To prove the constructive fraudulent transfer claim in Count II, Hitachi must show that GMF made a transfer "without receiving a reasonably equivalent value in exchange for the transfer . . . and [GMF] was insolvent at that time or [GMF] became insolvent as a result of the transfer."  6 Del. C. § 1305(a); § 726.106(1), Fla. Stat.

**A.  Constructive Fraudulent Transfer**

eCapital seeks summary judgment on the issue of whether any constructive fraudulent transfer occurred on the basis that GMF received reasonably equivalent value for the Nov. 2019 Transfer.  If eCapital can establish that GMF received reasonably equivalent value, it is entitled to prevail on the Motion because the absence of reasonably equivalent value is an element that

Hitachi will be required to prove at trial (to establish a constructive fraudulent transfer).  However, as discussed herein, eCapital solely focuses on the Nov. 2019 Transfer without also addressing in its Motion Hitachi's allegations regarding the Subsequent Transfers, which are also the subject of Counts I and II.  As such, I cannot conclude that no genuine dispute of material fact exists as to whether GMF received reasonably equivalent value in exchange for the transfers to eCapital.

"[I]n determining reasonably equivalent value, the essential examination is a comparison of 'what went out' with 'what was received.'"  *Kapila v. Univ. of Miami (In re Miami Neurological Inst., LLC)*, No. 17-10703-BKC-RAM, 2020 WL 3410182, at *6 (Bankr. S.D. Fla. June 19, 2020) (quoting *Kapila v. WLN Family Ltd. P'ship (In re Leneve)*, 341 B.R. 53, 57 (Bankr. S.D. Fla. 2006)).  "The concept of reasonably equivalent value does not require a dollar-for-dollar transaction."  *Crumpton v. Stephens (In re Northlake Foods, Inc.)*, 715 F.3d 1251, 1257 (11th Cir. 2013) (citing *Advanced Telecomm. Network, Inc. v. Allen (In re Advanced Telecomm. Network, Inc.)*, 490 F.3d 1325, 1336 (11th Cir. 2007)).  "Instead, courts make informed judgments as to asset valuation in light of the totality of the circumstances."  *Estate of Jackson v. Schron (In re Fundamental Long Term Care, Inc.)*, 873 F.3d 1325, 1344 (11th Cir. 2017).  Some courts apply a test that considers "the good faith of the parties, the disparity between the fair value of the property [transferred from the debtor to a third party] and what the debtor actually received, and whether the transaction was at arm's length."  *In re Caribbean Fuels Am., Inc,* 688 F. App'x 890, 895 n.3 (11th Cir. 2017) (quoting *In re Leneve*, 341 B.R. at 57).  While this test may be appropriate when considering indirect benefits, it should not be applied in many circumstances as value should be measured from an objective standpoint.  *See id.*  Nonetheless, value should be scrutinized more closely when dealing with a transfer to an insider.  *In re Advanced Telecomm. Network, Inc.*, 490 F.3d at 1336-37.

Here, the Counterclaim indicates that "what went out" included both the Nov. 2019 Transfer and the Subsequent Transfers. Hitachi only provides evidence of approximately $1.6 million in value of the Subsequent Transfers going to eCapital. Thus, the remaining $8.4 million of the Subsequent Transfers is irrelevant to calculating the value of "what went out" *to eCapital* because there is no record evidence that eCapital received any part of the Subsequent Transfers other than the $1.6 million. Accordingly, if Hitachi is correct about the value of the transfers to eCapital – which Hitachi contends is equal to face value – then eCapital received transfers valued at $14.39 million and $1.6 million.

With respect to the Nov. 2019 Transfer, the facts viewed in the light most favorable to Hitachi show that the value (at the time of the transfer) was somewhere close to the face value of $14.39 million, which Hitachi contends was the value. eCapital appears to place the value of the Nov. 2019 Transfer at no more than $14 million (and seemingly lower). It notes that Hitachi's Chief Credit Officer acknowledged that the accounts receivable included in the Nov. 2019 Transfer would have generated approximately $14 million. *See* Motion at 15.

eCapital nonetheless appears to assign a lower value (without expressly stating what the value is) by raising the hornbook law argument that an assignor can only assign to an assignee what the assignor has and that the assignor cannot assign what he does not have. Specifically, eCapital contends that when it assigned accounts receivable to GMF in the first instance, the value of what was assigned was not the full face value because eCapital's contracts with its customers limited eCapital to the right to keep the net amount due on accounts.[7] Thus, according to eCapital,

---

[7] As noted above, in certain instances, if eCapital collected accounts receivable above a certain threshold, it may have had a contractual obligation to pay certain reserve amounts to its customer. Thus, if required to pay such reserve amounts to its customer (for instance, where it collected 100% of the amounts owed by its customer's customers), eCapital would ultimately net a smaller amount of funds than the gross amount received from its customer's customers.

because it did not have the right to keep the full face value, its assignment of accounts receivable to GMF could not have conferred the right to keep the full face value (as the assignment would also be limited by eCapital's contracts with its customers).  In support of this argument, eCapital relies upon § 679.4041(1)(a), Fla. Stat., which provides as follows:

> (1)   Unless an account debtor has made an enforceable agreement not to assert defenses or claims, and subject to subsections (2) through (5), the rights of an assignee are subject to:
> (a)   All terms of the agreement between the account debtor and assignor and any defense or claim in recoupment arising from the transaction that gave rise to the contract[.]

§ 679.4041(1)(a), Fla. Stat.

Hitachi raises several reasons as to why this statute does not apply here.  Perhaps its most persuasive argument is what it terms its second argument on page 12 of its Response.  That is, Hitachi contends that eCapital's customer contracts make eCapital the absolute owner of the accounts receivable being purchased and do not entitle eCapital's customers to refunds, but merely provide for a Reserve Account in which a portion of the purchase price will be held in reserve. While Hitachi's "absolute owner" contention is on the right track (and may be correct), it is a different reason that eCapital's § 679.4041(1)(a) argument clearly fails.  Even if the statute would otherwise apply to limit the rights of GMF as assignee, it is the words eCapital omits (in its Motion) from the statute – combined with the contract language – that definitively show § 679.4041(1)(a) does not apply here.  Significantly, the statute begins by stating "[u]nless an account debtor has made an enforceable agreement not to assert defenses or claims." § 679.4041(1)(a), Fla. Stat.  And agreeing not to assert claims or defenses is precisely what eCapital's customers did in their contracts with eCapital.  Specifically, section 11.2.2 of eCapital's customer contracts [DE 73-4] expressly provides that "[e]ach Purchased Account is and will remain . . . unconditionally owed and will be paid to Purchaser without defenses, disputes, offsets, counterclaims, or rights of return

or cancellation."  Thus, § 679.4041(1)(a) could not have limited the value of the invoices (the accounts receivable) assigned from eCapital to GMF.

Now, that does not necessarily mean that the value of the assigned accounts receivable was exactly equal to the $14.39 million face value.  While both parties appear to agree that these accounts receivable were likely to realize close to their full face value (their maximum value), that value could be impacted by the timing of collection (from a time value of money perspective) and the risk of non-collection (which appears to have been low risk with these specific accounts receivable).  Nonetheless, viewing the facts in the light most favorable to Hitachi, the value of the Nov. 2019 Transfer to eCapital was likely around $14 million (as Hitachi's Chief Credit Officer testified, *see* [DE 73-10] at 42-43) and potentially closer to the face value amount of $14.39 million.

What came in for the Nov. 2019 Transfer appears to have been the $14 million paid pursuant to the Letter Agreement.[8]  Hitachi, however, argues that the Letter Agreement does not state that the $14 million was being paid to provide value in exchange for the Nov. 2019 Transfer. While I agree with Hitachi that the Letter Agreement does not expressly state that the $14 million was being provided in exchange for the Nov. 2019 Transfer, the only reasonable inference appears to be that the $14 million amount was agreed upon to address the value transferred out as part of

---

[8] Although the $14 million was paid to Hitachi, there does not appear to be any dispute (nor should there be) that the payment of $14 million to Hitachi conferred value on GMF.  It conferred value on GMF by reducing GMF's debt to Hitachi by $14 million.  Notably, "value" is provided for a transfer if, in exchange for the transfer, an antecedent debt is secured or satisfied.  6 Del. C. § 1303(a); § 726.104(1), Fla. Stat.  That is precisely what occurred here.

Additionally, while Hitachi contends that someone other than eCapital paid the $14 million to Hitachi, this argument is of no moment.  The statute simply requires that reasonably equivalent value be provided in exchange for the transfer.  It does not mandate that the transferee itself provide that value to the transferor or restrict a third party from providing the value on behalf of the transferee (so long as the value is provided "in exchange for the transfer").

the Nov. 2019 Transfer.  Hitachi's argument to the contrary is premised on its contention that the $14 million amount paid pursuant to the Letter Agreement cannot serve as reasonably equivalent value for both the Nov. 2019 Transfer and the Subsequent Transfers, which, according to Hitachi, involved the transfer of assets with a collective value of over $24 million.  While Hitachi is correct that $14 million cannot serve as reasonably equivalent value for $24 million, it would likely be unreasonable to infer that the $14 million in payments was provided in exchange for the Subsequent Transfers given that the Subsequent Transfers occurred after the parties signed the Letter Agreement (with one transfer potentially occurring around the date of the Letter Agreement).  There is also no evidence that the Subsequent Transfers were contemplated at the time of the Letter Agreement.  Moreover, it is evident from the undisputed facts that the Nov. 2019 Transfer was the catalyst for the Letter Agreement.  In other words, it was the Nov. 2019 Transfer (and not the Subsequent Transfers) that brought the parties to the table to negotiate the Letter Agreement.  Thus, the summary judgment evidence does not appear to provide any basis for a reasonable factfinder to find that the $14 million amount was agreed upon to account for anything other than the value that was transferred out as part of the Nov. 2019 Transfer.

But-for the subsequent $1.6 million transfer to eCapital, which is also included in the transfers alleged in Counts I and II of the Counterclaim, eCapital would likely be entitled to summary judgment on the issue of reasonably equivalent value (and, therefore, the constructive fraudulent transfer claims).  That is because, as Hitachi's own Chief Credit Officer acknowledged, the value of the accounts receivable that were transferred in November 2019 was approximately $14 million.  Even if the value was closer to the $14.39 million amount (the highest possible value), the sum paid ($14 million) was over 97% of that value.  That is plainly reasonably equivalent value, particularly given that there would have been at least some reason to discount (even if only

slightly) the face value of the accounts receivable based on the risk of non-collection and/or the time value of money.

Nonetheless, the Motion fails to account for the $1.6 million that eCapital received in the months following the Nov. 2019 Transfer.  In its Reply, eCapital contends that the value of the $1.6 million transfer was accounted for in the Nov. 2019 Transfer.  *See* [DE 96] at 9-10.  However, I cannot so conclude based upon the brief argument on this issue in the Reply (and the 2 BBCs cited in the Reply), particularly given that all reasonable inferences must be drawn in favor of Hitachi.  Moreover, eCapital failed to reply to Hitachi's additional facts [DE 93-1], which appear to show that eCapital received both the Nov. 2019 Transfer (valued around $14 million) and the subsequent $1.6 million transfer.  Additionally, I reiterate that eCapital should have addressed the subsequent transfer issue in the Motion rather than limiting its argument to the Nov. 2019 Transfer alone.

At any rate, because the facts viewed in the light most favorable to Hitachi reveal that eCapital received both the Nov. 2019 Transfer with a value of at least $14 million and the subsequent transfer with a value of approximately $1.6 million, which were both the subject of Counts I and II of the Counterclaim, and because GMF only received $14 million in return (apparently for the Nov. 2019 Transfer alone), it is necessary to proceed to trial.[9]

### B.  Actual Fraudulent Transfer

eCapital seeks summary judgment on the actual fraudulent transfer issue on two grounds. First, it claims that Hitachi cannot prove actual fraudulent intent – in other words, that the

---

[9] While I could arguably grant partial summary judgment on the issue of whether GMF received reasonably equivalent value in exchange for the Nov. 2019 Transfer alone, I find that the more appropriate course here is to address the issue at trial (which must occur regardless) given the potential interplay between the transfers at issue and the surrounding circumstances.

transfer(s) were made with the intent to hinder, delay, or defraud Hitachi.  As discussed herein, a reasonable factfinder could find otherwise.  Second, eCapital contends that it is entitled to summary judgment on its affirmative defense under § 726.109(1), Fla. Stat., which provides – like 6 Del. C. § 1308(a) – that an actual fraudulent transfer is not voidable "against a person who took in good faith and for a reasonably equivalent value."  As discussed above, the issue of reasonably equivalent value (the first element of the defense) will be decided at trial.  Additionally, as discussed herein, the issue of good faith (the second element of the defense) must also be decided at trial as a reasonable factfinder could find an absence of good faith.

As noted above, courts typically determine the existence of intent to hinder, delay, or defraud by examining the "badges of fraud."  eCapital contends that the undisputed facts reveal that Hitachi will be unable to prove the requisite intent.  In doing so, it asserts that the Nov. 2019 Transfer was made for the non-fraudulent purpose of facilitating the Woodforest transaction, that Hitachi knew in advance that the Woodforest transaction would occur and that the accounts receivable would need to be removed from the borrowing base to facilitate that transaction,[10] and that Hitachi received reasonably equivalent value (the $14 million paid in connection with the Letter Agreement).  In response, Hitachi asserts that the issue of actual fraudulent intent is generally not suitable for summary judgment and, in any event, that summary judgment is improper here because at least 3 badges of fraud exist (even putting aside the issue of reasonably equivalent value, which, in the actual fraudulent transfer context, represents a badge of fraud).

---

[10] While it appears to be undisputed that Hitachi was aware of the Woodforest transaction in advance as well as the forthcoming removal of accounts receivable from the borrowing base, this foreknowledge is not determinative.  Rather, it is simply a factor that supports eCapital because it shows that the transfer was not concealed (one of the badges of fraud).

Here, viewing the facts in the light most favorable to Hitachi, I agree with Hitachi that at least 3 badges of fraud exist.  First, eCapital is clearly an insider of GMF, a fact eCapital does not dispute.  Both eCapital and GMF are owned by Parent Co., and it is undisputed that both entities have the same boards of directors and are controlled by the same people.  Second, GMF transferred a substantial portion of its assets as part of the Nov. 2019 Transfer and transferred virtually all of its assets away between the Nov. 2019 Transfer and the Subsequent Transfers.  *See* [DE 92-22, 92-34].  eCapital again does not appear to dispute the existence of this badge of fraud.  Third, even if GMF was not insolvent at the time of the Nov. 2019 Transfer, the evidence strongly suggests that GMF became insolvent shortly after the time of the transfer.  Following the transfer, GMF's balance sheet reflected that it did not have the assets or liquidity to satisfy its debt to Hitachi.  Hi-ASF ¶ 32.  While eCapital contends in its Reply that Hitachi ignores previous months in which GMF was able to cure overadvances, this has little bearing on whether GMF was solvent from a balance sheet perspective following the Nov. 2019 Transfer.  Significantly, "[a] debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets, at a fair valuation."  6 Del. C. § 1302(a); § 726.103(1), Fla. Stat.  This certainly appears to be the case with GMF following the Nov. 2019 Transfer.

Given that at least three badges of fraud are present here, a reasonable factfinder could find for Hitachi on the issue of actual fraudulent intent.  *Cf. United States v. S. Cap. Constr., Inc.*, 758 F. App'x 676, 681 (11th Cir. 2018) (affirming district court's finding of actual fraud where district court's determination was based on three badges of fraud and other circumstantial evidence).  Therefore, summary judgment is inappropriate on this issue.

As to the issue of good faith (one of the elements of eCapital's affirmative defense), summary judgment is likewise inappropriate.  "To determine whether a transferee received a

transfer of assets in 'good faith,' the 'courts use an objective test to determine whether a transferee had actual or constructive knowledge of the debtor's fraudulent purpose.'" *Perlman v. Am. Express Centurion Bank*, No. 19-61386-CIV, 2021 WL 2598139, at *6 (S.D. Fla. Mar. 31, 2021) (quoting *In re Seminole Walls & Ceilings Corp.*, 446 B.R. 572, 596-97 (Bankr. M.D. Fla. 2011)). The issue of constructive knowledge turns on whether the transferee (eCapital) "had knowledge of such facts or circumstances as would have induced an ordinarily prudent person to make inquiry, and which inquiry, if made with reasonable diligence, would have led to the discovery of the transferor's fraudulent purpose." *Id.* at *7 (quoting *Wiand v. Waxenberg*, 611 F. Supp. 2d 1299, 1319 (M.D. Fla. 2009)). Here, given that both GMF and eCapital were controlled by the same people, a reasonable factfinder could certainly find that eCapital had actual or constructive knowledge of any fraudulent purpose on the part of GMF. Therefore, the issue of good faith cannot be determined on summary judgment in this case.

## II. COUNT III – CONVERSION

eCapital is not entitled to summary judgment on Hitachi's conversion claim. "Under Florida law, a conversion is 'an unauthorized act which deprives another of his property permanently or for an indefinite time.'" *Archer v. City of Winter Haven*, 846 F. App'x 759, 766 (11th Cir. 2021) (quoting *Fogade v. ENB Revocable Tr.*, 263 F.3d 1274, 1291 (11th Cir. 2001)). "A conversion claim is based on a positive, overt act or acts of dominion or authority over the money or property inconsistent with and adverse to the rights of the true owner." *Columbia Bank v. Turbeville*, 143 So. 3d 964, 969 (Fla. 1st DCA 2014) (internal quotation marks and citation omitted).

In its Motion, eCapital argues that Hitachi's conversion claim fails because Hitachi has not and cannot show that eCapital had any obligation to keep intact or deliver the specific proceeds

from the transferred accounts receivable, especially given that the parties had no contract between them.  However, as Hitachi correctly points out, eCapital's argument is misplaced.  The "specific fund" or "identification" requirement is one that is intended to apply in situations where there is a contractual obligation to pay money to ensure that a plaintiff is not transforming a contract dispute into a tort claim.  *See Bel-Bel Int'l Corp. v. Cmty. Bank of Homestead*, 162 F.3d 1101, 1108-09 (11th Cir. 1998); *Frayman v. Douglas Elliman Realty, LLC*, 515 F. Supp. 3d 1262, 1285-86 (S.D. Fla. 2021).  Here, the absence of a contractual relationship between eCapital and Hitachi is precisely the reason that eCapital's argument fails.[11]

## III.    COUNT IV – UNJUST ENRICHMENT

eCapital is not entitled to summary judgment on its unjust enrichment claim.  A party pursuing an unjust enrichment claim under Florida law must establish the following elements: "(1) the plaintiff has conferred a benefit on the defendant; (2) the defendant has knowledge of the benefit; (3) the defendant has accepted the benefit conferred; and (4) the circumstances are such that it would be inequitable for the defendant to retain the benefit without paying fair value for it." *F.H. Paschen, S.N. Nielsen & Assocs. LLC v. B&B Site Dev., Inc.*, 311 So. 3d 39, 48 (Fla. 4th DCA

---

[11] eCapital also argues that Hitachi's conversion claim fails because a conversion claim must be independent from a breach of contract.  While true, this argument is likewise misplaced for the very reason that there was no contract between eCapital and Hitachi (and thus no breach of contract claim asserted by Hitachi against eCapital).  *See Transcapital Bank v. Shadowbrook at Vero, LLC*, 226 So. 3d 856, 864 (Fla. 4th DCA 2017) ("[F]or a viable claim to exist for conversion or civil theft *when the parties have a contractual relationship*, 'the civil theft or conversion must go beyond, and be independent from, a failure to comply with the terms of a contract.'" (emphasis added) (citation omitted)).  Additionally, eCapital contends that a claim for conversion cannot lie where a debt can be discharged by the payment of money.  Again, this goes to the same idea that a conversion claim must be independent of any breach of contract, and therefore, is also misplaced because of the absence of a contract between eCapital and Hitachi.  In other words, Hitachi's theory is not that eCapital failed to pay Hitachi what eCapital was contractually obligated to pay Hitachi.  Rather, Hitachi's theory is that eCapital wrongfully exercised dominion or control over the accounts receivable transferred to eCapital knowing that Hitachi had a present right to possession of that property by virtue of its agreement *with a different entity*.

2021) (citing *Com. P'ship 8098 Ltd. P'ship v. Equity Contracting Co.*, 695 So. 2d 383, 386 (Fla. 4th DCA1997)).  Here, the basis for eCapital's argument is predicated on the same grounds as its reasonably equivalent value argument.  It contends that it received no benefit to the detriment of Hitachi because $14 million was paid to Hitachi to replace $14 million in accounts receivable that eCapital received from the borrowing base.  However, as discussed above, the facts viewed in the light most favorable to Hitachi show that eCapital received approximately $16 million in value. Therefore, eCapital cannot obtain summary judgment on Count IV.

## CONCLUSION

For the reasons discussed above, it is **ORDERED** and **ADJUDGED** that the Motion [DE 74] is **DENIED**.

**DONE AND ORDERED** in Fort Lauderdale, Florida, this 2nd day of May 2022.

**Jared M. Strauss**
**United States Magistrate Judge**